IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ROSEMARY WALTERS,                          )
     Plaintiff,                           )
                             )
           v.                              )     Civil No. 3:13cv33 (REP)
                             )
CAROLYN W. COLVIN,                         )
Acting Commissioner of Social Security,    )
     Defendant.                           )
_____)

## REPORT AND RECOMMENDATION

Rosemary Walters ("Plaintiff") is 45 years old and previously worked as a bartender and waitress. On September 8, 2008, Plaintiff applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act") with an alleged onset date of October 2, 2007, claiming disability due to bipolar disorder, mood disorder, history of aneurysm with residual cognitive deficits, cervical degenerative disc disease and degenerative joint disease of the right shoulder. Plaintiff presented her claim to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council granted Plaintiff's request for review and remanded the case back to the ALJ. After a second hearing, the ALJ again denied Plaintiff's request for benefits.

Plaintiff now challenges the ALJ's denial of benefits, asserting that the ALJ failed to follow the Appeals Council's remand order, erred in assessing Plaintiff's credibility, incorrectly determined Plaintiff's Residual Functioning Capacity ("RFC") and posed flawed hypotheticals to the Vocational Expert ("VE"). (Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem.") (ECF No. 11) at 17, 19, 24-25.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

### A. Education and Work History

Plaintiff is 45 years old and passed the General Educational Development ("G.E.D.") test. (R. at 31-32.) She worked as a bartender, bar manager and waitress for various restaurants before October 2, 2007, the alleged onset date of her disability. (R. at 33-34.) After October 2, 2007, Plaintiff worked at one restaurant for two or three days in 2008, but left after experiencing anxiety attacks. (R. at 33-34, 43-44.)

### B. Medical Records

#### 1. Physical Treatment

On November 28, 2006, Mark Rosenberg, M.D., treated Plaintiff for neck, shoulder and arm pain. (R. at 466.) Plaintiff rated her pain as a ten on a scale of one to ten. (R. at 466.) Dr.

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C.) In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

Rosenberg diagnosed Plaintiff with mechanical cervical back pain, prescribed a systematic treatment with Naprosyn and instructed her to call if her condition did not improve. (R. at 466.)

On August 31, 2007, Plaintiff received a physical from Dr. Rosenberg after complaining of posterior cervical and left scapular back pain for approximately six months. (R. at 465.) Plaintiff rated her pain as a nine or ten on a scale of one to ten, but noted that over-the-counter ibuprofen helped slightly. (R. at 465.) She experienced no numbness or weakness. (R. at 465.) Plaintiff previously took Zyprexa, but stopped before the appointment due to its side effects. (R. at 465.) Dr. Rosenberg prescribed Naprosyn for Plaintiff. (R. at 465.) Dr. Rosenberg encouraged Plaintiff to quit smoking and referred Plaintiff for physical therapy for her neck pain. (R. at 465.) On October 2, 2007, Plaintiff arrived at Memorial Regional Medical Center complaining of severe left face pain, knots at the back of her head that caused her to feel nauseated and a dull, throbbing pain across the top of her head down to her neck. (R. at 476.) Plaintiff placed her pain at an eight on a scale of ten. (R. at 476.)

On October 3, 2007, Peter A. Alexander, M.D., diagnosed Plaintiff with a ruptured left middle cerebral artery aneurysm with subarachnoid hemorrhage and Plaintiff underwent cranial surgery. (R. at 441-43.) During Plaintiff's follow-up appointment, Dr. Alexander noted that Plaintiff was "doing great" and showed no neurological deficits. (R. at 440.) He noted that Plaintiff still suffered from headaches and alternated between Fioricet and Norco for the pain. (R. at 440.) Dr. Alexander continued Plaintiff's use of Keppra, prescribed Xanax for anxiety and recommended physical therapy. (R. at 440.) Overall, Dr. Alexander opined that Plaintiff had done "well." (R. at 440.)

On December 4, 2007, Plaintiff complained of headaches and anxiety, but experienced no neurological defects. (R. at 449.) Dr. Alexander continued prescribing Percocet for Plaintiff's

3

headaches, because it helped. (R. at 449.) During Plaintiff's December 18, 2007 appointment, Plaintiff complained of significant headaches, neck pain and left arm pain. (R. at 439.) Dr. Alexander noted that Plaintiff was doing "quite well." (R. at 439.) Plaintiff underwent an MRI on January 8, 2008, which indicated mild midcervical degenerative disc disease, but no sign of focal disc herniation. (R. at 438.) On January 18, 2008, Dr. Alexander noted that Plaintiff appeared "very good" after the clipping of her aneurysm. (R. at 437.) Plaintiff's headaches were less severe than before and well-controlled with medicine. (R. at 437.)

Plaintiff visited Gregory Leghart, M.D., on February 27, 2008, when she received an epidural injection for her neck pain. (R. at 435-36.) Dr. Leghart opined that Plaintiff suffered cervical degenerative disc disease with spondylosis and a facet syndrome with secondary myofascial pain. (R. at 436.) He also indicated that Plaintiff's cervical disorder and the aneurysm clipping likely caused her headaches. (R. at 436.) Dr. Leghart recommended physical therapy and prescribed Celebrex. (R. at 436.) On September 24, 2008, Plaintiff returned to Dr. Leghart with complaints of pain that radiated into her shoulders and she indicated that her pain level registered at a seven or eight on a scale of ten. (R. at 685.)

During Plaintiff's October 1, 2008 appointment with Dr. Alexander, Dr. Alexander reported that Plaintiff had experienced some intermittent speech aphasia issues, but he opined that these issues were to be expected with Plaintiff's aneurysm clipping. (R. at 433.) On October 16, 2008, Plaintiff underwent a CT scan, which showed no additional aneurysms. (R. at 516.)

On October 31, 2008, Scott Schimpff, M.D., administered a cervical epidural steroid injection with no complications. (R. at 626.) On December 2, 2008, Plaintiff returned to Dr. Schimpff and received trigger-point injections in her right shoulder. (R. at 624.) Plaintiff was

4

pleased with the procedure and experienced no complications. (R. at 624.) Plaintiff attended an appointment with Dr. Leghart on December 4, 2008, during which she complained that the pain in her shoulder worsened after the injections that she received on December 2, 2008. (R. at 621.) Dr. Leghart recommended that Plaintiff continue the use of Lamictal and Vicodin and apply heat to her right shoulder. (R. at 622.)

On December 10, 2008, Plaintiff attended a follow-up appointment with Dr. Schimpff and complained of neck and shoulder pain. (R. at 619.) Dr. Schimpff noted that Plaintiff experienced tenderness and demonstrated a limited range of motion in her right shoulder. (R. at 620.) Dr. Schimpff diagnosed Plaintiff with post-injection steroid flare, cervical spondylosis, cervical spinal stenosis, cervical degenerative disc disease, right shoulder rotator cuff tear and myofasical pain. (R. at 620.) He provided Plaintiff with samples of Lidoderm patches to wear on the area of tenderness on her shoulder and prescribed hydrocodone for pain. (R. at 620.) Dr. Schimpff scheduled Plaintiff for two left C3 through C6 medical branch blocks. (R. at 620.) Plaintiff attended the first appointment on January 9, 2009, but did not go to the second appointment scheduled for January 16, 2009, due to an exacerbation of pain in her right shoulder following the first injection. (R. at 617.)

During Plaintiff's follow-up appointment with Dr. Schimpff on January 21, 2009, Plaintiff continued to complain of neck and shoulder pain, suffered limited right shoulder range of motion and experienced tenderness around the right shoulder. (R. at 617-18.) Plaintiff indicated that she did not want to continue taking Percocet, because it nauseated her. (R. at 617.) Therefore, Dr. Schimpff prescribed Vicodin for use in place of Percocet. (R. at 618.)

Plaintiff sought treatment from Shannon Wolfe, M.D., on January 22, 2009, for right shoulder and neck pain. (R. at 735.) Dr. Wolfe completed an MRI on January 25, 2009, which

5

revealed moderate hypertrophy of the midclavicular joint. (R. at 737.) Plaintiff returned for a follow-up appointment on February 11, 2009, during which Dr. Wolfe diagnosed Plaintiff with AC joint pain in her right shoulder. (R. at 633.) Dr. Wolfe recommended cortisone injections, but Plaintiff was "questionably allergic to cortisone" and Dr. Wolfe opined that not much else could be done for Plaintiff's shoulder pain. (R. at 633.)

On February 25, 2009, Plaintiff sought treatment from Dr. Schimpff regarding her neck and shoulder pain. (R. at 746.) Dr. Schimpff prescribed a trial of Robaxin and Duragesic, and ordered a physical therapy evaluation with a trial of deep muscle stimulation. (R. at 747.) On March 5, 2009, Kimberly Gordon, P.T., completed an initial general physical therapy evaluation. (R. at 753-55.) Ms. Gordon opined that Plaintiff was in pain and "reluctant to move." (R. at 754.) Plaintiff had a follow-up appointment with Dr. Schimpff on March 18, 2009, during which she continued to complain of neck and shoulder pain. (R. at 757-59.) Dr. Schimpff recommended that Plaintiff follow-up with Dr. Wolfe for surgical intervention. (R. at 758.)

On May 22, 2009, Dr. Wolfe performed a right shoulder arthroscopic distal clavicle excision, acromipolsty and labrum debridement. (R. at 732.) During Plaintiff's follow-up appointment on June 2, 2009, Plaintiff indicated that she was doing "very well" and Dr. Wolfe recommended that Plaintiff increase her activities and seek physical therapy. (R. at 695.)

On October 6, 2009, Dr. Schimpff treated Plaintiff for neck pain. (R. at 769-70.) Dr. Schimpff performed a left C3 through C6 medial branch block on November 4, 2009. (R. at 777.) Plaintiff again met with Dr. Schimpff on December 2, 2009, and Plaintiff indicated that she had a flare-up of pain after the injections she received during her last appointment. (R. at 779.) Dr. Schimpff advised Plaintiff to continue to take the prescribed amount of Vicodin. (R. at 780.)

6

Dr. Schimpff administered trigger-point injections on July 21, 2010, October 6, 2010, and April 1, 2011. (R. at 859, 886, 888.) Plaintiff was "pleased" with the procedures and Dr. Schimpff noted that Plaintiff's trigger-point injections were "effective." (R. at 859, 865, 886, 888.) On May 16, 2011, Dr. Schimpff recommended a spinal cord stimulator trial, but Plaintiff deferred the treatment. (R. at 834.)

### 2.   Mental Treatment

On December 20, 2007, Plaintiff sought treatment for her anxiety from Dr. Rosenberg, and he prescribed Ativan. (R. at 464.) On November 13, 2008, Plaintiff saw Asli Orhon, M.D., and complained of mood swings. (R. at 644.) Dr. Orhon prescribed Lamictal to improve Plaintiff's mood. (R. at 644.)

Donald Hanback, a licensed counselor at Hanover County Community Services, completed a mental status evaluation form on November 20, 2008. (R. at 571-75.) He diagnosed Plaintiff with a mood disorder, organic brain disease and bipolar disorder. (R. at 571.) Plaintiff admitted to prior alcohol and cocaine use, but denied present use. (R. at 571.) Plaintiff saw Dr. Orhon on December 8, 2008, January 12, 2009, and March 16, 2009, when Dr. Orhon recommended no changes to Plaintiff's medications. (R. at 641-643.) On March 19, 2009, Mr. Hanback completed a second mental status evaluation form in which he maintained his previous diagnosis of a mood disorder due to Plaintiff's organic brain disease. (R. at 635.)

On April 23, 2009, Plaintiff attended a follow-up appointment with Dr. Rosenberg for recurring anxiety symptoms. (R. at 678.) Plaintiff indicated that she took Ativan about four or five times a week and that crowded, public places brought on her anxiety symptoms. (R. at 678.) During Plaintiff's June 25, 2009 appointment with Dr. Rosenberg, Plaintiff complained of worsening anxiety, insomnia and panic attacks. (R. at 676.) Dr. Rosenberg discontinued

7

Plaintiff's use of Ativan and prescribed Xanax as needed for anxiety or help sleeping. (R. at 676.) Plaintiff returned on June 29, 2009, and told Dr. Rosenberg that she could not take Xanax because of the side effects. (R. at 675.) Dr. Rosenberg discontinued Plaintiff's use of Xanax and re-prescribed Ativan. (R. at 675.) On July 23, 2009, Dr. Orhon prescribed Prozac after Plaintiff complained of depression, anxiety and panic attacks. (R. at 706.)

On September 10, 2009, Plaintiff sought treatment from Dr. Rosenberg for anxiety and panic attacks. (R. at 674.) Plaintiff reported that the Ativan was not as helpful as before. (R. at 674.) Dr. Rosenberg discontinued Plaintiff's use of Ativan, prescribed Clonopin and Paxil, and told Plaintiff to return for a follow-up in two weeks. (R. at 674.) Plaintiff saw Dr. Rosenberg on September 24, 2009, and complained of on-going anxiety and panic symptoms. (R. at 673.) She indicated that Clonopin and Paxil were not helpful and that Ativan actually worked better. (R. at 673.) As a result, Dr. Rosenberg prescribed Valium. (R. at 673.)

On September 24, 2009, Mr. Hanback provided a statement to Plaintiff's counsel regarding his observations of Plaintiff. (R. at 651-67.) Mr. Hanback noted that he thought attending therapy more frequently would be helpful to Plaintiff. (R. at 657.) Mr. Hanback reported that Plaintiff could not handle a simple, routine, repetitive, one-to-two-step unskilled work task, such as making change in a parking garage, and would have difficulty in a production-oriented job. (R. at 659-60.)

On November 20, 2009, Dr. Orhon prescribed medication for bipolar disorder and panic disorder with agoraphobia, and assigned Plaintiff a Global Assessment of Functioning (GAF) score of 55.[2] (R. at 724.) On January 20, 2010, Dr. Orhon again assigned Plaintiff a GAF score

---

[2] A GAF of 55 falls within a range of "moderate symptoms," characterized by "flat affect and circumstantial speech or occasional panic attacks" or "moderate difficulty in social, occupational, or school functioning," characterized by having "few friends" or experiencing

of 55 and continued Plaintiff's prescriptions. (R. at 729.) During an appointment with Mr.

Hanback in June 2011, Plaintiff noted that her panic attacks were less frequent. (R. at 896.)

In October 2011, Mary Wells, a licensed psychologist, completed a psychological

evaluation for Plaintiff. (R. at 907-911.) During the appointment, Plaintiff appeared alert and

oriented. (R. at 909.) Plaintiff noted short-term memory loss from brain surgery, but denied any

significant cognitive changes. (R. at 909.) Ms. Wells recommended that Plaintiff maintain

physical activity to the degree possible. (R. at 911.)

      C.  Plaintiff's Testimony

         1.  Hearing on January 27, 2011

Plaintiff testified during a hearing before an ALJ on January 27, 2010, stating that she felt

anxious and scared, despite having taken her medication that day. (R. at 47.) Plaintiff lived with

her oldest son and boyfriend. (R. at 31.) Plaintiff's other son lived with his father, because

Plaintiff was frequently aggravated, depressed and anxious, and she did not want her son to be

around her. (R. at 52.) Plaintiff held a valid driver's license and she picked up her son from

ROTC twice weekly. (R. at 32.)

Plaintiff received injections for pain in her neck and left shoulder, but they did little to

help her pain. (R. at 34-35.) Plaintiff began taking prescription pain medication after October 2,

2007, which sometimes helped with the pain. (R. at 35-36.) However, the pain medication made

her nauseous and her doctors attempted to remedy it by prescribing different medications. (R. at

40.) Plaintiff also attended physical therapy, but it did not alleviate her pain, because she could

---

"conflicts with peers or co-workers." DSM-IV-TR 34 (American Psychiatric Association 2000).
Notably, the latest version of the DSM has dropped the use of GAF scores, finding that their use
has been criticized due to a "lack of conceptual clarity," and "questionable psychometrics in
routine practice." DSM-5 16 (American Psychiatric Association 2013).

not perform the exercises. (R. at 51.) Plaintiff indicated that health care providers recommended other procedures to help with the pain, but Plaintiff had not undergone the procedures due to other health problems. (R. at 41.)

Plaintiff reported that on a scale of one to ten, her pain ranged between a four and a ten. (R. at 36.) She estimated that her pain registered at a four for more than two weeks over the last thirty days. (R. at 48.) When her pain was at a four, Plaintiff cooked, folded laundry and tried to do everything she could. (R. at 48.) On the days when her pain was a ten, Plaintiff did nothing. (R. at 48.) Plaintiff used Fentanyl patches approximately five or six times a month when her pain registered at a nine or ten. (R. at 50.) Plaintiff experienced serious headaches two or three times each month, which she treated with medicine and she would "stay in a dark room and lay there." (R. at 55.) Plaintiff slept two to four hours a night, even with sleep medication. (R. at 39.)

Plaintiff could brush her teeth and go to the bathroom without assistance from others and she prepared meals, cleaned the house and attended appointments. (R. at 39-40.) When going to the store, Plaintiff carried light items, like chips and eggs, but her son lifted heavier items such as soda. (R. at 37.) She could move all of her fingers, write and use the computer without difficulty. (R. at 38-39.) Plaintiff's health-care providers instructed her not to lift anything heavy, but offered no other permanent restrictions. (R. at 41.) Plaintiff played board games like Yahtzee, though she complained that she experienced trouble concentrating and her son frequently helped her. (R. at 54.)

Plaintiff attempted to return to work in 2008, but left after experiencing anxiety attacks. (R. at 43-44.) Plaintiff did not want to return to work for fear of suffering more attacks from being around so many people. (R. at 44.) She received an offer of employment at Bass Pro

Shops, but "freaked out," went back to her car and waited approximately ten to fifteen minutes before driving home. (R. at 44-46.) Plaintiff noticed a difference in herself on the days when she remembered to take the medicine and on days when she forgot. (R. at 42.) Plaintiff also attended therapy, which helped most while at the actual appointment. (R. at 53.) Plaintiff attended therapy for scheduled appointments and sometimes called for an appointment or help over the phone when she had a bad day. (R. at 53.) Her pain medicine and anxiety medicine were prescribed, but she took more when needed. (R. at 49-50.)

Plaintiff's aneurysm affected her memory, which caused her to forget where she left things or who called on the phone. (R. at 51.) She got lost while going to pick up her son at his father's home. (R. at 51.) Plaintiff indicated that personality changed after her aneurysm and that she had no social life since the aneurysm. (R. at 52.)

2. Hearing on September 14, 2011

Plaintiff testified during a hearing before an ALJ on September 14, 2011. (R. at 61-71.) She indicated that she had two sons and lived with her youngest son and her boyfriend. (R. at 62.) Plaintiff's youngest son attended school and her boyfriend worked. (R. at 62.)

Plaintiff attended pain management where she received shots in her neck and shoulder, but they did not help with the pain. (R. at 65-66.) Plaintiff underwent neck surgery in October 2010 and received shots. (R. at 66.) The injections and medicine failed to alleviate her pain. (R. at 66.) Since undergoing surgery, Plaintiff reported no improvement in her ability to move her neck. (R. at 67.) Plaintiff experienced migraines once or twice a month, depending on her stress level. (R. at 67.)

Plaintiff attended therapy at least once a week and visited a psychiatrist once a month. (R. at 67-68.) She experienced panic attacks a few times a week, which caused Plaintiff to feel

scared and feel like she had a heart attack. (R. at 68-69.) The attacks typically lasted less than

ten minutes. (R. at 69.) Sometimes, Plaintiff suffered more than one attack per day. (R. at 70.)

D. Function Report

On October 23, 2008, Plaintiff completed a function report and indicated that her day

included waking up her son up for school, going back to bed after he got on the bus, waking up

and taking her medication, doing as much as she could do around the house, preparing meals and

sitting around. (R. at 249-56.) Plaintiff took medications between two and four times per day.

(R. at 249.) Plaintiff cared for her son by cooking him dinner and spending time with him. (R.

at 250.) Plaintiff's condition affected her speech, sleep, memory and ability to work, exercise

and socialize. (R. at 250.) She had no problems with her personal care. (R. at 250.) She

prepared meals for about 30 minutes to an hour daily. (R. at 251.) However, her condition

required her to cook simpler meals. (R. at 251.) Plaintiff cleaned and laundered clothes, and her

mother helped with chores and pushed Plaintiff to complete these activities. (R. at 251.)

Plaintiff went outside daily and walked or rode in a car. (R. at 252.) She could not go

out alone because of her panic attacks. (R. at 252.) Plaintiff only drove to places nearby her

home. (R. at 252.) She shopped for groceries and clothes in stores for one to two hours each

week. (R. at 252.) Because Plaintiff could not pay bills, handle a savings account or use a

checkbook, Plaintiff's mother handled her finances. (R. at 252.)

Plaintiff listed sleeping, reading, watching television, spending time with her sons and

visiting with friends in her home as her hobbies. (R. at 253.) She spent time talking to others,

either in person or on the phone and playing board games with her sons. (R. at 253.) Plaintiff

went to the grocery store and her mother's house once a week, but needed reminders to go places

and someone to accompany her. (R. at 253.) She had trouble getting along with her neighbors

12

and family members on occasion. (R. at 254.) Plaintiff did not leave her house as often as before her condition and had trouble understanding others. (R. at 254.)

Plaintiff indicated that her condition affected her ability to lift, squat, bend, reach, talk, complete tasks, concentrate, understand, remember, follow instructions and get along with others. (R. at 254.) Her condition did not affect her ability to walk, sit, stand, hear, see, climb stairs or use her hands and she could walk half a block before needing to rest. (R. at 254.) She could pay attention for a very short time and could not finish what she started. (R. at 254.) Plaintiff experienced difficulty following written instructions, but could follow spoken instructions. (R. at 254.) She experienced problems getting along with authority figures and Plaintiff was fired from Ruby Tuesdays because "the people [she] worked with were idiots and [she] told [the manager] that." (R. at 255.)

Plaintiff took medication to handle stress and Plaintiff could not handle changes in her routine. (R. at 255.) Since her brain aneurysm, Plaintiff feared getting into a car accident or falling down the stairs. (R. at 255.)

E.   Third Party Function Report

On November 8, 2008, Plaintiff's mother, Patricia P. Jones, submitted a third-party function report. (R. at 282-92.) Ms. Jones indicated that she saw Plaintiff daily and took responsibility for Plaintiff's medicine, household cleaning, laundry and grocery shopping. (R. at 282.) On a normal day, Ms. Jones reported that Plaintiff helped get her son off to school and slept a lot. (R. at 283.) Plaintiff went to doctor appointments when scheduled. (R. at 283.) Plaintiff received help to care for her son, prepare his meals and do his laundry. (R. at 283.) Plaintiff's pain affected her ability to sleep. (R. at 284.)

Plaintiff experienced no difficulty in tending to her own personal care and only sometimes needed reminders to do so. (R. at 284-85.) However, Plaintiff needed reminders to take her medicine. (R. at 285.) Plaintiff prepared her own meals daily, but needed help cooking full meals. (R. at 285.) Plaintiff also needed reminders to turn things off and take things off the stove. (R. at 285.) Ms. Jones cleaned Plaintiff's home weekly, but Plaintiff did some light work around the house. (R. at 285-86.)

Plaintiff could not drive and required someone to accompany her when leaving the house. (R. at 286.) She shopped at the grocery store for approximately forty-five minutes each week. (R. at 287.) Her condition affected her ability to pay bills and handle a savings account, so Ms. Jones handled Plaintiff's finances. (R. at 287.)

Plaintiff's hobbies included watching television and spending time with her son. (R. at 287.) Plaintiff socialized with her family when they stopped to visit, but she struggled to get along with others because of her irritability and aversion to company. (R. at 288.) Ms. Jones indicated that Plaintiff's condition affected Plaintiff's ability to lift, climb stairs, use her hands, bend, understand, kneel, squat, sit, concentrate, talk, complete tasks, remember, follow instructions and get along with others. (R. at 288.) However, Plaintiff experienced no problem standing, walking, reaching, hearing or seeing. (R. at 288.) Plaintiff struggled to follow written instructions and could not pay attention for longer than 30 minutes. (R. at 289.) Plaintiff could sometimes follow spoken instructions and was "mostly okay" with getting along with authority figures. (R. at 289.)

F. Psychology Report

Linda Dougherty, Ph.D., a licensed clinical psychologist, evaluated Plaintiff on February 19, 2008, at the request of the state agency. (R. at 401-09.) During the evaluation Plaintiff

appeared alert and oriented.  (R. at 402.)  Dr. Dougherty reported that Plaintiff's thought

processes were clear and coherent, thought content was appropriate, affect was neutral and mood

was congruent to the situation.  (R. at 402-03.)  Plaintiff could repeat six digits forward, repeat

four digits backward and name the months of the year backwards.  (R. at 403.)

Plaintiff rated herself as a two or three on a one-to-ten scale of depression with one being

the most depressed and ten being the happiest.  (R. at 403.)  She reported symptoms of anxiety,

feelings of nervousness and difficulty concentrating, and she experienced mood swings that

lasted for two to three days.  (R. at 403.)  During these periods, Plaintiff reported a decreased

need for sleep, racing thoughts, increased self-esteem, agitation, engagement in excessively

pleasurable activities and increased talking and animation.  (R. at 403.)  Plaintiff indicated that

she could independently bathe, groom and dress herself, prepare a simple meal, clean up after

herself and perform routine household tasks.  (R. at 402.)  On a typical day, Plaintiff said she

woke up around 6:30 a.m. to get her sons ready for school and spent the rest of her day

"hang[ing] out at the house."  (R. at 402.)

Plaintiff's working memory capacity was comparable to that of others in her age group,

but she scored extremely low on the immediate memory index such that Dr. Dougherty opined

that Plaintiff may experience significant difficulty in situations where she had to remember new

information.  (R. at 405.)  Plaintiff showed significant difficulty in retrieving recently learned

information after a 25-30 minute delay.  (R. at 405.)  Dr. Dougherty noted no retention

difficulties for auditory or visual information.  (R. at 405.)  Plaintiff could solve basic

mathematical operations in her head and indicated that she could manage her own funds.  (R. at

408.)

Overall, Plaintiff exhibited Borderline Intellectual Functioning. (R. at 407.) Plaintiff displayed focal memory problems in terms of her immediate memory. (R. at 407.) Plaintiff's general memory functioning, however, was in the borderline range and consistent with intellectual function. (R. at 407.) Dr. Dougherty assigned Plaintiff a GAF score of 45.[3] (R. at 407.)

Dr. Dougherty opined that Plaintiff could perform simple, repetitive tasks and would likely be able to maintain regular attendance in the workplace and complete a normal workday. (R. at 408.) Dr. Dougherty also noted that Plaintiff would need additional supervision due to her bipolar and cognitive disorders. (R. at 408.) Dr. Dougherty further opined that Plaintiff would experience difficulty accepting instructions from supervisors and interacting with co-workers and the public for the same reason. (R. at 408.)

G. Non-treating State Agency Physician's Opinion

1. Physical Residual Functional Capacity Assessment

On January 13, 2009, James Wickham, M.D., completed a physical residual functional capacity assessment. (R. at 587-93.) Dr. Wickham determined that Plaintiff could occasionally lift fifty pounds and could frequently lift twenty-five pounds. (R. at 588.) Plaintiff could stand and/or walk six hours during an eight-hour work day and could sit for about six hours during an eight-hour work day. (R. at 588.) Plaintiff had unlimited ability to push and pull, and no postural, manipulative, visual, communicative or environmental limitations. (R. at 588-90.) On May 1, 2009, Robert Chaplin, M.D., a second state agency physician, reviewed and affirmed Dr. Wickham's functional capacity assessment. (R. at 645.)

---

[3] A GAF of 45 falls within a range of "serious symptoms," characterized by "suicidal ideation, severe obsession rituals, frequent shoplifting" or "serious impairment in social, occupational, or school functioning," characterized by having "no friends" or the inability to keep a job." DSM-IV-TR 34 (American Psychiatric Association 2000).

## 2.  Mental Residual Functional Capacity Assessment

On January 13, 2009, Alan Entin, Ph.D., a state agency reviewing psychologist, completed a mental residual functional capacity assessment.  (R. at 608-10.)  He opined that Plaintiff was not significantly limited in her ability to:  (1) remember locations and work-like procedures, (2) understand and remember very short and simple instructions, (3) carry out very short and simple instructions, (4) perform activities within a schedule, maintain regular attendance  and be punctual within customary tolerances, (5) sustain an ordinary routine without special supervision, (6) make simple work-related decisions, (7) ask simple questions or request assistance, (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, (9) be aware of normal hazards and take appropriate precautions, and (10) travel in unfamiliar places or use public transportation.  (R. at 608-09.)

Plaintiff suffered moderate limitations in her ability to:  (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in coordination with or proximity to others without being distracted by them, (5) complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (6) interact appropriately with the general public, (7) accept instructions and respond appropriately to criticism from supervisors, (8) ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (9) respond appropriately to changes in the working setting, and (10) set realistic goals or make plans independently of others.  (R. at 608-09.)  He determined that Plaintiff suffered no marked limitations.  (R. at 608 09.)  On May 4, 2009, Leslie E. Montgomery, Ph.D., a second state

17

agency psychologist, reviewed and affirmed Dr. Entin's functional capacity assessment. (R. at 646.)

H. Vocational Expert Testimony

Following the Appeals Council's remand, an impartial VE testified during a hearing on September 14, 2011. (R. at 59-85.) The ALJ asked the VE to consider an individual with the ability to perform light, simple, unskilled work with occasional contact with the general public. (R. at 75.) The ALJ then asked the VE if jobs existed in the national, region, state or local economies that could be performed at the light, simple, unskilled level with occasional contact with the general public. (R. at 75.) The VE opined that the person could work a number of unskilled jobs with limited contact with the general public, including laundry sorter with 50,000 jobs nationally and 500 jobs in Virginia, non-postal mail clerk with 55,000 jobs nationally and 1,250 jobs in Virginia, and lastly, as a small product assembler with 48,000 jobs nationally and 800 jobs in Virginia. (R. at 76.)   Plaintiff's counsel posed additional hypotheticals to the VE. (R. at 79-84.)

## II.   PROCEDURAL HISTORY

Plaintiff protectively filed for SSI and DIB on September 8, 2008, claiming disability due to bipolar disorder, mood disorder, a history of aneurysm with residual cognitive deficits, cervical degenerative disc disease, and degenerative joint disease of the right shoulder with an onset date of October 2, 2007. (R. at 14, 16, 202-207, 208-209.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration. (R. at 115-125.) On January 27, 2010, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 28-58.) On April 14, 2010, the ALJ denied Plaintiff's application, finding that she was not disabled under the Act. (R. at 94-105.)

18

Upon Plaintiff's April 14, 2010 appeal, the Appeals Council vacated and remanded the ALJ's decision. (R. at 112-113.)  The ALJ afforded great weight to Dr. Doughtery's opinion, which included the opinion that Plaintiff would likely need additional supervision, but such limitation was not included in the hypothetical posed to the VE to support the ALJ's determination that such would have minimal effect on Plaintiff's occupational base. (R. at 113.) Therefore, the Appeals Council remanded the case to the ALJ to obtain evidence from a VE to clarify the effect of the limitations on the claimant's occupational base. (R. at 112-113.)

Following the remand order by the Appeals Council, the ALJ conducted a supplemental hearing on September 14, 2011, during which Plaintiff and a VE testified. (R. at 59, 72-85.)  On October 21, 2011, the ALJ denied Plaintiff's application for the second time. (R. at 11-27.)  The Appeals Council subsequently denied Plaintiff's request for review on November 5, 2012, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-5.)

### III.   QUESTIONS PRESENTED

A. Did the ALJ follow the Appeals Council's remand order?

B. Did the ALJ err in assessing Plaintiff's credibility?

C. Does substantial evidence support the ALJ's determination of Plaintiff's Residual Function Capacity?

D. Did the ALJ's hypothetical posed to the VE account for all of Plaintiff's limitations?

### IV.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir.

19

2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 309, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (citation and quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 472 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[4]  20 C.F.R. §§ 416.920(b), 404.1520(b).  If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition.  *Id.*  If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function.  20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends.  20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[5] based on an assessment of

---

[4]  SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R.  Substantial work activity is "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities.  20 C.F.R. § 404.1572(c).

[5]  Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's residual functional capacity ("RFC")[6] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5 (1987)). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R.

---

[6] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted.)

§§ 416.920(f)(1), 404.1520(f)(1).

## V.   ANALYSIS

### A.  ALJ Opinion

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability. (R. at 16.)  At step two, the ALJ found that Plaintiff had the severe impairments of bipolar disorder, mood disorder, a history of aneurysm with residual cognitive deficits, cervical degenerative disc disease and degenerative joint disease of the right shoulder. (R. at 16.)  However, at step three, the ALJ determined that that these impairments did not meet or equal any listing in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 16-17.)  The ALJ next determined that Plaintiff maintained the ability to perform light work, except that she was limited to simple, unskilled work with no more than occasional contact with the general public. (R. at 18-19.)  In making this determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of her condition were not fully credible to the extent that they were inconsistent with the residual functional capacity assessment. (R. at 20.)

The ALJ then determined at step four that Plaintiff could not perform her past relevant work as a bartender. (R. at 26.)  At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that there are occupations that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 26.) Specifically, the ALJ found that Plaintiff could work as a laundry folder/sorter, non-postal mail clerk and small products assembler. (R. at 27.)  Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that she was not entitled to benefits. (R. at 27.)

23

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem. at 30.) Specifically, Plaintiff argues that the ALJ erred in failing to follow the Appeals Council's remand order, assessing Plaintiff's credibility, determining Plaintiff's RFC and posing the hypothetical to the VE. (Pl.'s Mem. at 17, 19, 24-25.) Defendant contends that the ALJ applied the correct legal standard, that the ALJ properly addressed the Appeals Council's remand order and that substantial evidence supports the ALJ's determinations. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 13-14, 19.)

B. The ALJ properly followed the Appeals Council's remand order.

Plaintiff argues that the ALJ failed to follow the remand order, because the ALJ failed to include in the hypothetical posed to the VE the limitation that Plaintiff required additional supervision. (Pl.'s Mem. at 17.) Defendant maintains that the ALJ's opinion is not inconsistent with the Appeals Council's remand order. (Def's Mem. at 13-14.)

The Appeals Council vacated and remanded the ALJ's decision to the ALJ to obtain evidence from a VE to clarify the effect of the assessed limitations on the claimant's occupational base. (R. at 112-113.) In remanding, the Appeals Council concluded that the ALJ erred by failing to include the limitation that Plaintiff would require additional supervision into a hypothetical posed to the VE, because the ALJ afforded Dr. Dougherty's opinion, which included the need for additional supervision, controlling weight and indicated that Plaintiff's limitation requiring additional supervision had little effect on Plaintiff's occupational base. (R. at 112-13, 408.) However, the Appeals Council determined that the need for additional supervision falls outside of the requirements for unskilled work, which provides a substantial occupational base. (R. at 113.) Therefore, the ALJ's assertion that Plaintiff's limitation

24

requiring additional supervision had little effect on Plaintiff's occupational basis was unsupported.

Following remand, the ALJ obtained the testimony of a VE, reconsidered all of the evidence and issued a new decision on October 21, 2001. (R. at 14-27.) In this decision, the ALJ gave Dr. Dougherty's opinion that Plaintiff could perform simple, unskilled work with additional supervision "some, but not controlling weight" on the basis that Dr. Dougherty's GAF determination was inconsistent with Dr. Dougherty's observations and Plaintiff's conservative treatment record. (R. at 22.)

Plaintiff argues that the ALJ failed to follow the Appeals Council's remand order by failing to ensure that the VE took into account Plaintiff's limitation that she required additional supervision as Dr. Dougherty's opinion. (Pl.'s Mem. at 16-18.)   However, Plaintiff's argument incorrectly interprets the Appeals Council's order.  Plaintiff argues that the Appeals Council's remand order required the ALJ to include Dr. Dougherty's opinion that Plaintiff needed additional supervision in the ALJ's hypothetical to the ALJ. (Pl.'s Mem. at 17-18.) Rather, the Appeals Council ordered the ALJ to gather VE testimony to "clarify the effect of the assessed limitations of the claimant's occupational base." (R. at 113.)

The ALJ complied with the Appeals Council's order in obtaining VE testimony to address Plaintiff's limitations.  While the ALJ did not include the limitation that Plaintiff required additional supervision in the hypothetical posed to the VE, such was not required as it was not a limitation that the ALJ determined that Plaintiff experienced after affording Dr. Dougherty's opinion some, but not controlling weight.  Indeed, the Appeals Council did not instruct the ALJ to adopt or credit any portion of Dr. Dougherty's 2008 opinion. (R. at 112-113.)

Further, substantial evidence supports the ALJ's decision regarding the weight afforded

to Dr. Dougherty's opinion on the basis that the GAF that Dr. Dougherty assigned was

inconsistent with the record.  Dr. Dougherty assigned Plaintiff a GAF of 45, which indicated that

Plaintiff suffered "serious impairment in social, occupational, or school functioning,"

characterized by having "no friends" or the inability to keep a job.  DSM-IV-TR 34 (American

Psychiatric Association 2000); (R. at 407).  However, Plaintiff herself indicated that she spent

time with her sons and visited with friends in her home.  (R. at 253.)  She only occasionally had

difficulty getting along with neighbors and family members.  (R. at 254.)  Plaintiff's mother

spent time with Plaintiff daily.  (R. at 282.)  Her mother indicated that Plaintiff socialized with

her family when they stopped to visit.  (R. at 288.)  Further, Plaintiff mostly got along with

authority figures.  (R. at 289.)

Dr. Entin and Dr. Montgomery opined that Plaintiff had no significant limitation in

maintaining socially appropriate behavior and only moderate limitations in her ability to interact

appropriately with the general public, accept instructions and respond appropriately to criticism

from supervisors, get along with co-workers or peers without distracting them or exhibiting

behavioral extremes.  (R. at 608-09.)  Therefore, the ALJ did not fail to adhere to the Appeals

Council's remand order, as the ALJ was required to obtain VE testimony to account for

Plaintiff's assessed limitations, which the ALJ correctly found did not include a limitation

requiring additional supervision.

C.  Substantial Evidence Supports the ALJ's assessment of Plaintiff's credibility.

Plaintiff argues that the ALJ applied the incorrect legal standard when assessing

Plaintiff's credibility, because Plaintiff's objective medical evidence alone substantiated

Plaintiff's symptoms and, therefore, requires only a one-step analysis.  (Pl.'s Mem. at 24.)

26

Further, Plaintiff contends that substantial evidence fails to support the ALJ's credibility assessment. (Pl.'s Mem. at 25.)  Defendant maintains that the ALJ correctly applied the two-step analysis and that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 18-19.)

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a).  The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  *Id.*; SSR 96-7p, at 1-3.  The ALJ must consider all of the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added).

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements.  *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

Contrary to Plaintiff's argument, the ALJ correctly applied the required two-step inquiry for evaluating credibility.  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" — thus satisfying the first prong of the required analysis. (R. at 20.)  Then, the ALJ evaluated Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms," finding the statements "not

credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 20.)  Based on the Fourth Circuit's ruling in *Craig*, the ALJ did not err in applying the two-step analysis in evaluating Plaintiff's subjective symptoms, because such a two-step analysis was required.

This Court must give great deference to the ALJ's credibility determination. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)).  Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ determined that Plaintiff's underlying medical impairments could reasonably be expected to produce her alleged symptoms. (R. at 20.)  The ALJ then found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her condition were not fully credible to the extent that they were inconsistent with the residual functional capacity assessment. (R. at 20.)  Substantial evidence supports the ALJ's credibility assessment.

Plaintiff's reports of pain are inconsistent with her own statements and other medical evidence.  After her cranial surgery, Dr. Alexander noted that Plaintiff was "doing great" and showed no neurological defects. (R. at 440.)  During subsequent follow-up appointments, Plaintiff was doing "quite well" and appeared "very good." (R. at 437, 439.)  While Plaintiff complained of chronic residual headaches, Plaintiff's headaches were well controlled with

28

prescription drugs. (R. at 449.) Plaintiff's physician noted that the headaches were not severe and were well controlled with medicine. (R. at 437.)

Plaintiff complained of cervical back pain, but Plaintiff's physician considered an MRI of Plaintiff's cervical spine to be "essentially negative." (R. at 437.) Despite Plaintiff's complaints of shoulder pain, Plaintiff did not attend a second follow-up appointment regarding trigger-point injections. (R. at 617.) When Plaintiff told Dr. Schimpff that the trigger-point injections were not working, Dr. Schimpff referred Plaintiff to Dr. Wolfe, who recommended cortisone injections, but Plaintiff was "questionably allergic to cortisone." (R. at 633.) Plaintiff eventually had right shoulder surgery and after the procedure Dr. Wolfe opined that Plaintiff was doing "very well" and recommended physical therapy and an increase in activities. (R. at 695.)

Plaintiff also began taking prescription pain medication after October 2, 2007, and said that the medicine sometimes helped with the pain. (R. at 35-36.) Plaintiff's health-care providers recommended procedures to help with the pain, but Plaintiff did not undergo the procedures. (R. at 41.) Further, Plaintiff's doctors have not recommended the use of an assistive device to help her get around on a daily basis. (R. at 41.)

Plaintiff's physicians prescribed multiple medications for her anxiety symptoms and alleged bipolar disorder. (R. at 464-65, 469, 644, 673-74, 675-76, 678, 706, 724.) In September 2009, Plaintiff reported to Dr. Rosenberg that Ativan was not as helpful for her anxiety symptoms as before. (R. at 674.) As a result, Dr. Rosenberg prescribed Clonopin and Paxil, but two weeks later, Plaintiff returned and told Dr. Rosenberg that Ativan worked better. (R. at 673.) During an appointment with Mr. Hanback in June 2011, Plaintiff noted that her panic attacks were less frequent. (R. at 896.) During her psychological examination with Dr. Wells,

29

Plaintiff noted short-term memory loss from brain surgery, but denied any significant cognitive changes. (R. at 909.)

Plaintiff's own statements further support the ALJ's determination. Plaintiff reported that she had no trouble standing, walking, climbing stairs, using her hands, hearing or seeing. (R. at 254.) Furthermore, she did not need a cane, walker or wheelchair and she could walk approximately one-half block before needing to take a break. (R. at 254-255.)   Plaintiff had no problems with her personal care and she could prepare meals, clean and do laundry. (R. at 251.) She could drive short distances, shop for groceries and visit her mother's house. (R. at 252-253.)   Plaintiff listed spending time with her sons as her hobbies and noted that she spent time talking to others, either in person or on the phone. (R. at 253.)  Accordingly, substantial evidence supports the ALJ's credibility determination.

> D.   Substantial evidence supports the ALJ's determination that Plaintiff retained the RFC to perform limited light work.

Plaintiff argues that the ALJ erred in his determination that Plaintiff retained the ability to perform limited light work. (Pl.'s Mem. at 19.)  Specifically, Plaintiff argues the ALJ used a simplified version of a RFC that failed to address Plaintiff's need for additional supervision and "bypassed several other aspects on a 'function-by-function' basis which were part of [Plaintiff's] limitations." (Pl.'s Mem. at 19.)  Defendant responds that the ALJ's determination is supported by substantial evidence. (Def.'s Mem. at 17.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.902(e)-(f), 416.945(a)(1).  In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b).

Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff maintained the ability to perform light work, further limited to simple, unskilled work with no more than occasional contact with the general public. (R. at 18-19.) Performing light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Further, light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* Unskilled work "is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968.

As indicated above, the Appeals Council's remand order did not require the ALJ to take into account any specific limitations. Therefore, the ALJ did not err in failing to include specific limitations into Plaintiff's RFC. Further, substantial evidence supports the ALJ's RFC determination.

Dr. Wickham opined that Plaintiff was unlimited in her ability to push and pull, and she had no postural, manipulative, visual, communicative or environmental limitations. (R. at 588-890.) He also noted that Plaintiff could occasionally lift fifty pounds and could frequently lift twenty-five pounds. (R. at 588.) Dr. Wickham further opined that Plaintiff could stand and/or

31

walk six hours during an eight-hour work day and could sit for about six hours during an eight-hour work day. (R. at 588.) Dr. Wickham's review of the evidence indicated that Plaintiff was capable of light, exertional work. (R. at 593.) Upon review, Dr. Chaplin affirmed Dr. Howard's assessment. (R. at 645.) As far as Plaintiff's mental capabilities, Dr. Entin concluded that Plaintiff was not markedly limited in any category. (R. at 608-09.) Upon review, Dr. Montgomery affirmed Dr. Entin's assessment. (R. at 646.)

Plaintiff's own statements support the ALJ's determination. Plaintiff reported that she had no trouble standing, walking, climbing stairs, using her hands, hearing or seeing. (R. at 254.) Furthermore, she did not need a cane, walker or wheelchair and she could walk approximately one-half block before needing to take a break. (R. at 254-255.) Plaintiff had no problems with her personal care and she could prepare meals, clean and do laundry. (R. at 251.) She could drive short distances, shop for groceries and visit her mother's house. (R. at 252-253.) Plaintiff listed reading, watching television and spending time with her sons as her hobbies and noted that she spent time talking to others, either in person or on the phone. (R. at 253.) She had no problem following spoken instructions. (R. at 254.)

Ms. Jones, Plaintiff's mother, indicated that Plaintiff experienced no difficulty in tending to her own personal care. (R. at 285.) Plaintiff prepared her own meals daily, did some light work around the house and shopped at the grocery store each week. (R. at 285-287.) Additionally, Ms. Jones noted that Plaintiff watched television, spent time with her son and socialized with family. (R. at 287-88.) Plaintiff experienced no problem standing, walking, reaching, hearing or seeing. (R. at 288.) Therefore, substantial evidence supports the ALJ's determination that Plaintiff maintained the ability to perform light work.

32

E.  The hypothetical posed to the VE correctly accounted for all of Plaintiff's limitations.

Plaintiff argues that Defendant failed to meet her burden at step five, because the hypothetical failed to ensure that the VE knew Plaintiff's abilities and limitations. (Pl.'s Mem. at 17.) Defendant contends that the hypotheticals posed to the VE accurately took into account Plaintiff's RFC. (Def.'s Mem. at 17.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f).  The Commissioner can carry her burden in the final step with the testimony of a VE.  As noted earlier, when a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

During a hearing on September 14, 2011, the ALJ asked the VE to assume an individual maintained the ability to perform "work that is light, and further limit[ed] to simple, unskilled work with occasional contact with the general public." (R. at 75.)  The VE opined that the person could work a number of unskilled jobs with limited contact with the general public, including laundry sorter with 50,000 jobs in the nationally and 500 jobs in Virginia, non-postal mail clerk, with 55,000 jobs nationally and 1,250 jobs in Virginia, and lastly, as a small product assembler with 48,000 jobs nationally and 800 jobs in Virginia. (R. at 75.)

33

The ALJ's hypothetical posed to the VE accounts for Plaintiff's RFC.  The Appeal's Council's remand order did not require the ALJ to take into account specific limitations when posing the hypothetical to the VE and the hypothetical accurately described Plaintiff's condition. As determined above, substantial evidence supports the ALJ's RFC determination.  In finding that substantial evidence supports the ALJ's RFC determination, and because the hypothetical posed to the VE took into account all of Plaintiff's limitations described in the RFC, the ALJ's hypothetical was proper.

## VI.    CONCLUSION

For the reasons discussed herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and recommendation to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: January 6, 2014